**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bobby Gene HAYES, and Joseph Ward,
Defendants-Appellants.**

No. 81-7316.

United States Court of Appeals,
Eleventh Circuit.

May 24, 1982.

Rehearing and Rehearing En Banc
Denied Aug. 24, 1982.

---

Jones, Worozbyt & Nodvin, Theodore S. Worozbyt, Atlanta, Ga., for Hayes.

Howard M. Zeidwig, Fort Lauderdale, Fla., for Ward.

William R. Favre, Jr., Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.

Before THORNBERRY\*, FAY and HATCHETT, Circuit Judges.

FAY, Circuit Judge:

The appellants, Bobby Gene Hayes and Joseph Ward, challenge their convictions of conspiracy to possess with intent to distribute marijuana, 21 U.S.C. § 846, and of conspiracy to import marijuana, 21 U.S.C. § 963, on the grounds that the multiple jury procedure followed by the district court denied each a fair trial and due process of law. Joseph Ward additionally attacks his conviction as violative of the fifth amendment guarantee against double jeopardy. Our scrutiny of the record and evaluation of counsel's arguments reveal no such errors of constitutional dimension. We therefore reject the appellants' objections and affirm the conviction of each.

I. *Procedure* : Minding Their Pleas and Clues

On November 21, 1978, the appellants were jointly indicted with Thomas Meacham, Ed William Gilroy and Donald L. Metsger on three counts of drug-related charges: attempt to possess with intent to

---

\* Honorable Homer Thornberry, U. S. Circuit Judge for the Fifth Circuit, sitting by designa- tion.

distribute marijuana, in violation of 21 U.S.C. § 846; conspiracy to attempt to distribute and to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846; and conspiracy to attempt to import marijuana, in violation of 21 U.S.C. § 963. Following Meacham's plea of guilty to count three, all other charges against him were dropped. At the close of the government's case against the four remaining defendants, the court dismissed count one in light of the prosecution's failure to establish proper venue. The jury found co-defendants Ward, Gilroy and Hayes guilty of the remaining counts; Metsger was convicted on count three and acquitted on count two. Ward and Hayes were sentenced to consecutive prison terms of three and one-half years on each of the two counts.

On appeal, Meacham's guilty plea was vacated and his conviction consequently overturned. The Fifth Circuit reversed, as well, the convictions of his co-defendants, on the grounds that the indictment failed to state an offense. The court additionally found that Ward should have been granted a severance. *United States v. Meacham*, 626 F.2d 503 (5th Cir. 1980).

All five defendants were subsequently reindicted on charges stemming from the same transaction upon which the former indictment had been based. Prior to trial, the court granted the government's motion to impanel two juries—one to try Ward, the other to try his co-indictees. Five days after the government's motion was granted, three guilty pleas were entered, leaving Hayes and Ward as the sole defendants. Following their simultaneous trials and convictions by two separate juries, Hayes's previous sentence of two consecutive three and one-half year prison terms was reimposed; Ward's sentence was increased to two consecutive terms of five years each.

## II. *Facts*: The Plane Truth

From 1970 to 1978, Joseph Ward served as a police officer with the Fort Lauderdale Police Department. Prior to that time, Ward had worked as a commercial pilot in New Jersey. In March, 1978, Ward was approached by Thomas Meacham, an acquaintance from New Jersey, who asked if Ward would be interested in flying an airplane "down south" on behalf of certain individuals in Connecticut for the purpose of importing marijuana. R. Vol. V at 259.-43, 263. Ward informed the Drug Enforcement Administration [DEA] of this proposition and, at a meeting taped by the DEA, accepted it. Ward then contacted Donald Metsger, a lifelong friend who, together with his son, Grant, operated an airport in Ocean Springs, Mississippi. Donald agreed to procure for Ward a DC–3 airplane and pilot able to fly to Colombia. The money for the purchase of the plane was supplied to Metsger by Ward, Gilroy and Meacham. Around Labor Day of 1978, Donald asked Travis Paul, a commercial pilot from Alabama, if Paul were interested in "making a large sum of money flying an airplane to go down south." R. Vol. II at 62. Travis replied that he might be, requested some time to think about the offer and asked Metsger to call him back. Metsger agreed. Travis immediately contacted the DEA office and offered to operate as an undercover informant. Paul then phoned Metsger at the airport in Ocean Springs and accepted the proposal.

Through Metsger, Paul was contacted by an individual calling himself "Trucker," who offered Paul $50,000 to pilot the plane and $20,000.00 to any co-pilot Paul could enlist. One week later, Trucker asked Paul to travel to Atlanta for a meeting with him and several other people. On September 17, Trucker—whom Paul later ascertained was none other than the appellant, Joseph Ward—met Paul at the Atlanta airport. Approximately twenty minutes later, they were joined by two other individuals, subsequently identified as Hayes and Meacham. Entering a van driven by Hayes, the parties traveled to a dirt strip airport in Newnan, Georgia, to determine if it were adequate to accommodate the plane they intended to use to import marijuana. The parties then drove back to Atlanta and proceeded to the Fulton County Airport. After Ward left the group, Meacham paid for a small plane which Paul piloted back to the Newnan airstrip to test landing conditions; the appellant, Hayes, was a passenger in the

plane. After returning to the Fulton County Airport, Paul flew back to Alabama.

On September 20, Paul, Meacham and Gilroy attended a second meeting in Miami, at which they planned four trips by Paul to Barranquilla, Colombia to import, in all, 120,000 pounds of marijuana. In preparation for the flight, Paul traveled to Barranquilla on the airlines via a ticket supplied by Meacham. He was taken to the Colombian airstrip where he was to pick up the load, and later flew back to Alabama. After Paul returned from Colombia, Ward called to ask how the trip had gone. By this time, Ward, who had remained active in the conspiracy despite having been taken off the case by the Fort Lauderdale Police Department, was himself under surveillance by the DEA as a suspect.

On October 8, Paul and his co-pilot, also an undercover agent, began the flight to Barranquilla. The plane developed fuel problems and crash landed in the ocean just north of the Colombia coast. A passing ship rescued both men. Meanwhile that same evening, an individual named Wademan, who had been brought to the Newnan Airport by Gilroy and Meacham, was acting as a lookout. On hearing a loud noise which Wademan thought was a plane engine, he saw a car drive up, heard someone call him and entered the auto. The car sped away with its driver, Hayes, trying to elude a vehicle following them. Several minutes later, they were overtaken by the vehicle, driven by DEA Agent Taylor, and were promptly arrested. The remaining conspirators, Ward, Gilroy, Meacham and Metsger, were apprehended in the days that followed.

III. *The Law*

A. Double Trouble?

The appellants were initially indicted for conspiring to attempt to distribute and to import marijuana. Upon the Fifth Circuit's reversal of their conviction for failure of the indictment to charge an offense, Hayes and Ward were reindicted for conspiring to distribute and to import marijuana. Ward presently insists that because his first conviction was reversed, the second indictment,

trial and conviction were barred by the constitutional guarantee against double jeopardy. Countering Ward's claim is the prosecution's quite logical contention that, since no crime had been alleged in the first indictment, the appellants were never subjected to jeopardy thereby; the first indictment having been a nullity, so too were the initial trial and conviction. Prior case law supports the government's reasoning:

> Although the rationale for this "well-established part of our constitutional jurisprudence" [that double jeopardy does not bar retrial following a reversal] has been variously verbalized, it rests ultimately upon the premise that the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean.

*North Carolina v. Pearce,* 395 U.S. 711, 721, 89 S.Ct. 2072, 2078, 23 L.Ed.2d 656 (1969). *See also Twice in Jeopardy,* 75 *Yale L.J.* 262, 263, n.3 (1965).

■ Our examination of the established core of purposes and principles encircling the double jeopardy guarantee bolsters the government's position further still. The double jeopardy provision has been characterized as safeguarding a defendant against both multiple punishment for the same offense and harassment or overreaching by the prosecution. *See, e.g., United States v. Brown,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977) ("Where the judge is forbidden to impose cumulative punishment for two crimes at the end of a single proceeding, the prosecutor is forbidden to strive for the same result in successive proceedings.") *Ex Parte Lange,* 85 U.S. (18 Wall.) 163, 173, 21 L.Ed. 872 (1873). Consequently, while retrial of a defendant for the very offense of which he was either acquitted, *Green v. United States,* 355 U.S. 184, 190, 78 S.Ct. 221, 225, 2 L.Ed.2d 199 (1957); *Kepner v. United States,* 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904); *United States v. Ball,* 163 U.S. 662, 671, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896), or convicted with no later appellate reversal, *Ex Parte Lange, supra; In re Nielsen,* 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1888), and the meting out of more than a single punishment of him for the same offense at one trial, *Unit-*

ed States v. Benz, 282 U.S. 304, 307–09, 51 S.Ct. 113, 114, 75 L.Ed. 354 (1931); *Ex Parte Lange, supra,* are prohibited, retrial following a reversal most certainly is not:

> [I]t is quite clear that a defendant who procures a judgment against him upon an indictment to be set aside, may be tried anew upon the same indictment or upon another indictment, for the same offense of which he had been convicted.

*United States v. Ball,* 163 U.S. 662, 672, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896). *See also United States v. Tateo,* 377 U.S. 463, 465, 84 S.Ct. 1587, 1588, 12 L.Ed.2d 448 (1964).[1]

Courts and commentators have propounded a variety of theories favoring this construction of the double jeopardy clause: The "waiver" theory posits that by appealing his conviction, a defendant waives his double jeopardy right. *Bryan v. United States,* 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950); *Trono v. United States,* 199 U.S. 521, 533, 26 S.Ct. 121, 124, 50 L.Ed. 292 (1905). The "one continuing jeopardy" theory states that where a second trial arises out of the same judicial proceeding as the first, double jeopardy does not preclude the new trial, *Bryan, supra* ; Bis Vexari: New Trials and Successive Prosecutions, 74 Harv. L.Rev. 1, 7–8 (1960). Still other cases have perceived the double jeopardy clause as representing, most fundamentally, a balance between the defendant's right to finality, on the one hand, and the public's interest in law enforcement, on the other. *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949). Applying this balancing test in instances of retrial following reversal of conviction, the Supreme Court has concluded that the defendant's interest can be relatively outweighed. *Wade v. Hunter, supra* at 689, 69 S.Ct. at 837. *See also United States v. Perez,* 9 Wheat. (22 U.S.) 579, 6 L.Ed. 165 (1824); *United States v. Castellanos,* 478 F.2d 749, 752 (2d Cir. 1973).

■ Regardless of the various labels attached to the above theories, common to each is the recognition that once a defendant affirmatively seeks and obtains a reversal of his conviction, none of the traditional policies underlying the double jeopardy clause, such as avoidance of multiple punishment or prosecutorial harassment, apply. As Justice Black noted in upholding the retrial of a defendant whose initial prosecution had never come to a final judgment,

> [any other construction of the double jeopardy clause] would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double jeopardy provision is aimed.

*Wade, supra* at 689, 96 S.Ct. at 837.

This insight was echoed by Justice Harlan in *United States v. Tateo, supra,* when he held that retrial of a defendant who had obtained a reversal of his conviction did not violate double jeopardy:

> While different theories have been advanced to support the permissibility of retrial, of greater importance than the conceptual abstractions employed to explain the *Ball* principle are the implications of that principle for the sound administration of justice. Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing

---

1. The one exception to this fastly-held rule is the granting of reversal for insufficiency of evidence. In *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1977), the Supreme Court held that

> the Double Jeopardy clause precludes a second trial once the reviewing court has found that the evidence is legally insufficient.

*Id.* at 18, 98 S.Ct. at 2150.

The Court offered the following rationale for its ruling:

> The Double Jeopardy clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.

*Id.* at 11, 98 S.Ct. at 2147.

Recognizing the unique danger of prosecutorial overreaching which would exist were retrial permitted following reversal for evidentiary insufficiency, the Court was careful to reaffirm the general rule allowing retrial following reversal on the completely different grounds of "trial error, *i.e.,* failure to dismiss a faulty indictment," *id.* at 14, 98 S.Ct. at 2148. We point out that the latter was precisely the reason reversal was granted in the case at bar.

one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest.

*Id.* at 466, 84 S.Ct. at 1589.

We note, additionally, that in reversing the appellants' convictions in *United States v. Meacham, supra,* the Fifth Circuit expressly anticipated the likelihood of reindictment, taking care to analyze several issues which it believed would attain significance only in such event:

> The appellants raise several other issues on appeal. Although the foregoing disposes of these appeals, we believe we should address three of the remaining issues in the event of re-indictment.

626 F.2d at 510.

 We therefore find no merit in the appellant Ward's claim of double jeopardy as to his reindictment. Neither do we accept Ward's objection to his resentencing as similarly unconstitutional. In *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the Supreme Court delineated the scope of judicial discretion in changing a sentence once imposed:

> We hold . . . that neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction. A trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of

events subsequent to the first trial that may have thrown new light upon the defendant's "life, health, habits, conduct, and mental and moral propensities." *Williams v. New York,* 337 U.S. 241, 245, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337. Such information may come to the judge's attention from *evidence adduced at the second trial itself,* from a new presentence investigation, from the defendant's prison record, or possibly from other sources. [emphasis added]

*Id.* at 723, 89 S.Ct. at 2079.

 Following Ward's initial conviction, he was sentenced to two consecutive terms of three and one-half years. After the jury found him guilty upon retrial, Ward's sentence was increased to two consecutive five year terms. The validity of Ward's resentencing hinges upon whether the trial judge complied with the mandate of *Pearce* that

> whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

*Id.* at 726, 89 S.Ct. at 2081.

The record reflects that the trial judge based his increased sentence on three considerations: evidence which had been excluded in the initial trial regarding Ward's efforts through the DEA to cover up his criminal involvement in the conspiracy; deterrence of such criminal activity particularly on the part of law enforcement officers such as Ward who hold positions of public trust; and Congress's increase since Ward's initial sentence of the maximum penalty for his offense.[2] Since the trial judge had declined to impose the maximum

---

**2.** The trial judge offered the following explanation of his decision to increase the appellant's sentence:

> The last time that this case was tried by me and the sentence was imposed, it was for 3½ years as to each count, and to run consecutive.

penalty in sentencing Ward following his first conviction, we frankly fail to comprehend the judge's present reliance on factors of additional deterrence or statutory increase in the maximum penalty. Nevertheless, we find that the first of the three reasons offered by the judge appears to comply fully with the directive of *Pearce*. While the trial judge's grounding of his increased sentence on evidence introduced for the first time at Ward's retrial regarding his cover-up activities during the course of the conspiracy may not appear at the outset to meet the literal requirement expressed in one part of the Supreme Court's opinion in *Pearce* that the trial judge base his resentencing upon data regarding conduct on the part of the defendant occurring after the original proceeding, 395 U.S. at 726, 89 S.Ct. at 2081, it does appear consonant with the Court's holding earlier in *Pearce* that a new sentence may be based on events subsequent to the first trial, including evidence adduced at the second, which shed light on the defendant's conduct, *id.* at 723, 89 S.Ct. at 2079. Certainly the testimony available only at the second trial establishing Ward's cover-up of his criminal conduct would be comprehended in the latter dictate of *Pearce*.

We are not unmindful of the views expressed by various circuit courts of appeal strictly construing the language of *Pearce*

so as to foreclose the trial judge's consideration on resentencing of any conduct by a defendant which did not actually occur after the first sentencing. *See, e.g., United States v. Tucker*, 581 F.2d 602, 606 (7th Cir. 1978); *United States v. Cunningham*, 529 F.2d 884, 888 (6th Cir. 1976). This court respectfully disagrees with such a narrow interpretation, which we believe distorts the logic of *Pearce*.

By the Supreme Court's own admission, the primary evil sought to be controlled in *Pearce* was that of judicial vindictiveness:

> Due process of law ... requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.

*Id.* at 725, 89 S.Ct. at 2080. The trial judge here negated any possible interpretation of his increased sentence as motivated by vindictiveness. Rather, he grounded his resentencing on evidence introduced for the first time at Ward's retrial[3] which demonstrated

---

Since that time Congress has seen fit to increase the penalty, apparently considering that the penalty for this type of thing was not severe enough to deter others from doing it, or at least that is one of the considerations to be advanced.

I am not unmindful of the position which you have advanced, Mr. Zeidwig, on behalf of your client. On this retrial the Court was made aware of the extent to which efforts were made by your client through DEA to clear himself as he advanced it. That information was not in that last trial by virtue of my ruling.

It is particularly offensive to our system that persons holding positions of public trust violate that public trust and utilize that information that comes to them by reason of that trust to engage in criminal activity as this jury has found in this case. I accept the ruling of the jury and finding of the jury in regard to the facts.

I think the circumstances are different in that the Court now is aware of the length and

effort that was gone to hide the involvement in the case, the deterrent factors are such that the public generally ought to know that it is disapproved and there is some obligation by this Court to the general public which is forthcoming to insure or see to it that that type of situation does not continue to occur. It is particularly bad for a police officer to find himself in this type of situation.

R. Vol. V at 476–78.

3. The record shows clearly that the trial judge was not aware of the extent of Ward's efforts to deceive other law enforcement officials until such evidence was introduced during the second trial. We are not dealing with a situation where such conduct, or information concerning its full extent, might have been made known to the trial judge during hearings or within a pre-sentence investigative report, though not actually received in evidence. This trial judge first learned of this activity during the second trial.

Ward's efforts as a police officer to delude the DEA regarding his active participation in the ongoing conspiracy. Such evidence, consisting of cross-examination testimony regarding telephone calls between Ward and Agent Hoyt of the Drug Enforcement Administration, had been excluded at Ward's initial joint trial because it would have implicated his co-defendants; once his severance was granted on retrial, the rationale for exclusion ceased to exist and the testimony was admitted. We find that the trial judge's reliance on the conduct of Ward in hiding his criminal activity, which came to light only at the second trial, provides an adequate basis for the increase of Ward's sentence and one which comports fully with the constitutional imperative of *Pearce.* Accordingly, we affirm the appellant's increased sentence of two consecutive five year terms.

### B. *Juror Furor?*

In *United States v. Meacham, supra,* the Fifth Circuit agreed with the appellant Ward's contention that he should have been granted severance at his initial trial. Following the indictment of Ward and his co-defendants, the government moved to adopt a multiple jury procedure which would effectuate a severance while conserving judicial time and resources. Pursuant to this technique, two juries would be impaneled; one would sit in judgment on Ward, while the other would try the remaining four co-defendants. The judge granted the motion, careful to point out that Ward's complete severance would be ensured by instructing each jury to consider only that evidence relevant to the particular defendant(s) whom they would be trying and by momentarily excusing one jury in the event evidence were to be introduced against the defendant(s) being tried by the other jury. Although several days after the motion was granted Meacham, Metsger and Gilroy all pled guilty, leaving Ward and Hayes as the only defendants, the court went ahead with the procedure. Hayes and Ward now claim that the use of multiple juries denied each a fair trial and due process of law.

Neither the Fifth nor the Eleventh Circuit has had occasion to rule on the propriety of the multiple jury procedure; hence, we look for guidance to those circuit courts of appeal which have ruled on similar alternative jury techniques.

In *United States v. Crane,* 499 F.2d 1385 (6th Cir. 1974), the Sixth Circuit upheld the use of a bifurcated trial in which a single jury heard evidence and adjudicated the guilt of each co-defendant separately. Warning of the dangers of this technique, the court stated:

> [J]ustice, not judicial economy is the first principle of our legal system. And under no circumstances may well-intentioned efforts to conserve judicial time be permitted to prejudice the fundamental right of a criminal defendant to a fair trial.

*Id.* at 1388.

Conceding the overriding right of a defendant to a fair trial, the court simultaneously acknowledged the genuine difficulties confronting trial courts regarding expenditures of judicial time and energy. In view of the absence of any specific indicia of prejudice, in addition to the jury's finding of guilt as to only one of the two co-defendants, the court in *Crane* was convinced that no constitutional violation had occurred.

Although the instant appellants, unlike the co-defendants in Crane, were both adjudicated guilty, neither has alleged any more than a generalized possibility of harm. Ward claims that his defense of immunity as an undercover agent was antagonistic to the entrapment defense of Hayes; Hayes argues that the prosecution improperly alluded to Ward's being a defendant during its cross-examination of Ward and summation. Having reviewed these claims, we find that they demonstrate no prejudice to the appellants' constitutional rights. Moreover, the impaneling of two separate juries and the careful instruction of each by the judge would seem to have eradicated any possible jury carryover of guilt from one

defendant to the other, as was alleged with reference to the bifurcated trial in *Crane.*

In *United States v. Sidman,* 470 F.2d 1158 (9th Cir. 1972), *cert. denied,* 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973), the Ninth Circuit upheld the multiple jury procedure as fully protective of each co-defendant's rights, specifically observing that

> The Judge was meticulous in explaining to the entire panel and to each jury that there would be two juries, one to try the guilt or innocence of Sidman and the other to try the guilt or innocence of Clifford, and instructed each jury not to talk to anyone about the trial and particularly not to talk to any of the other jurors in the case. He even gave an appellation to each jury, that is, one he called the Clifford jury and the other the Sidman jury. We were told on oral argument that one jury sat in the jury box and the other jury in chairs immediately in front of the jury box.

*Id.* at 1168.

The instant record reflects precisely the same degree of meticulousness on the part of the trial judge, who explained in detail the procedure to both panels; instructed them not to talk about the case until the close of trial; gave each jury distinct labels of Panel Number Two (the Hayes jury) and Panel Number Three (the Ward jury); and physically separated the panels in the courtroom by seating one in the jury box and one in red chairs. *See* R. Vol. IV at 2–10.

In *Sidman, supra,* two juries were impaneled to hear evidence in cases tried simultaneously against two defendants charged with bank robbery. Although the trial court did not articulate the rationale for following the procedure, the Ninth Circuit recognized that it was, like that of the trial court in the case at bar,

> undoubtedly one of economics, that is, conserving the juries time and costs, the

Court's time, and the witnesses' time, costs and convenience.

*Id.* at 1170.

Contrary to the stance of our appellants, who would impugn such concerns for judicial economy as illegitimate, we applaud innovative efforts to resolve the overwhelming obstacles facing trial judges, particularly in the context of multi-defendant, multi-count cases. While we do not endorse use of the multiple jury procedure in this case where, given the fact that only two of the original five defendants actually went to trial, its purpose was not realized,[4] neither do we condemn it on the basis of its novelty alone. Rather, we concur with the court in *Sidman, supra,* which adopted the position of the Third Circuit in *Byrne v. Matczak,* 254 F.2d 525, 529 (3d Cir. 1958), *cert. denied,* 358 U.S. 816, 79 S.Ct. 24, 3 L.Ed.2d 58 (1958), that

> "fair new procedures, which tend to facilitate proper fact finding, are allowable, although not traditional." Cf. *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (State criminal jury trial by six not in violation of Sixth Amendment); *Colgrove v. Battin,* 456 F.2d 1379 (9th Cir. 1972) (Federal civil jury trial by six not in violation of the Seventh Amendment).

*Id.* at 1168.

Accordingly, we reject the appellants' challenge to the multiple jury procedure at their trials and hereby AFFIRM the conviction of each.

---

4. According to the calculations submitted by counsel for the appellant Hayes in his brief on appeal, use of the multiple jury procedure resulted in a savings of approximately 86 pages of transcript, representing testimony which otherwise would have been repeated. Had the original five defendants in the case gone to trial, the savings in judicial time would undoubtedly have far exceeded this amount.