**UNITED STATES of America, Plaintiff,**

**v.**

**Ian Orville AIKEN, et. al., Defendants.**

**No. 97–0233–CR.**

United States District Court, S.D. Florida.

Nov. 22, 1999.

John S. Kastrenakes, Asst. U.S. Atty., West Palm Beach, FL, Alyson Fritz, Asst. U.S. Atty., Miami, FL, Richard Getchell, Asst. U.S. Atty., for U.S.

Alvin Entin, Ft. Lauderdale, FL, for Donovan Sibbley.

Jane Moscowitz, H. Dohn Williams, Miami, FL, for Ian Orville Aiken.

William D. Matthewman, Boca Raton, FL, for Roland David Aiken.

Eric Cohen, Miami, FL, for Daniel Patrick Allen.

Kirk A. Barrow, Lauderdale Lakes, FL, for Eric Livingston.

## AMENDED ORDER ON DEFENDANTS' PENDING MOTIONS TO DISMISS COUNT THREE OF SUPERSEDING INDICTMENT AND TO SEVER TRIAL OF CAPITAL AND NONCAPITAL DEFENDANTS

GOLD, District Judge.

**THIS MATTER** is before the court on Defendant, Ian Orville Aiken's Motion to Dismiss Count Three of the Second Superseding Indictment for Lack of Venue [D.E. # 408, 440], and the Motions for Severance filed by the capital defendant, Ian Orville Aiken [D.E. # 374], and by the non-capital defendants, Roland David Aiken, Daniel Patrick Aiken, Donovan Sibbley and Eric Livingston Morris [D.E. # 371]. For reasons stated below, the motions are denied.

### I. DEFENDANT IAN ORVILLE AIKEN'S MOTION TO DISMISS COUNT THREE OF THE SECOND SUPERSEDING INDICTMENT FOR IMPROPER VENUE.

A. *Background.*

Defendants Ian Orville Aiken, Roland David Aiken, Daniel Patrick Aiken, Donovan Sibbley and Eric Livingston Morris

are charged in a nine count superseding indictment with being members of a racketeering enterprise, the Moscow Posse, and conspiring to participate in the affairs of that enterprise though a pattern of racketeering activity [count one]; conspiring to commit the murder of Derrick Christian and the commission of Christian's murder in aid of racketeering [counts two and three]; conspiring to commit the murder of Desmond LaTouche and the commission of LaTouche's murder in aid of racketeering [counts four and five]; assault with a dangerous weapon in aid of racketeering and the carjacking of Robert Williams [counts seven and eight], and the firearms charges in connection with the LaTource homicide [count six] and the carjacking of Williams [count nine].

Regarding Count Three, the United States has filed a Notice of Intention to Seek the Death Penalty against Ian Orville Aiken for the alleged murder of Derrick Christian in aid of racketeering. The Government proffers that the evidence will conclusively demonstrate each of the defendants' participation in other uncharged murders and numerous uncharged violent acts, including robberies, home invasions, kidnaping and carjackings. Further, the Government proffers that it will link the conspiracy and the murder of Derrick Christain with the conspiracy and murder of Desmond LaTouche (which occurred within several hours of each other) to each charged defendant and to the goals and mission of the Moscow Posse. Therefore, it is the Government's position that each defendant charged in the superseding indictment will be proven to have committed these acts with each other, and to have participated extensively in the operation of the criminal enterprise.

### B. *Venue as to Count Three.*

█ Count Three of the Second Superseding Indictment charges that Ian Orville Aiken murdered Derrick Christian a/k/a "Melvin Chung," in aid of racketeer-

ing, in violation of Title 18, United States Code, Sections 1959(a)(1) and 2. Defendant Ian Aiken argues that, because the victim was allegedly murdered in the Eastern District of New York, venue is appropriate in that district and Count Three must be dismissed. The Defendant asserts, and the Government does not dispute, that Christian was shot and died in Brooklyn, New York.

Although he does not cite case law in support of his argument, the Defendant relies on Article III, Section 2, of the United States Constitution which provides that the "Trial of all crimes ... shall be held in the State where the said crimes shall have been committed ....", and by the Sixth Amendment, which provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed." Additionally, the Defendant relies on two specific federal statutes.[1] First, Title 18 U.S.C. § 3235, which provides that "[t]he trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience." Second, Title 18 U.S.C. § 3236, which provides that "In all cases of murder or manslaughter, the offenses shall be deemed to have been committed at the place where the injury was inflicted, or the poison was administered or other means employed which caused the death, without regard to the place where the death occurs."

The Government responds that the Defendant is not charged with the unitary offense of murder, but with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a), a continuing offense. It, therefore, argues that venue is not governed by Sections 3235 and 3236, but by 18 U.S.C. § 3237, which states that, except as otherwise provided by Congress, "... [a]ny of-

---

**1.** The Defendant claims further support from Fed.R.Crim.P. 18, which provides in part that, except as otherwise permitted by statute or by rule, the prosecution shall be held in a district in which the offense was committed.

fense against the United States begun in one district and completed in another, or committed in more than one district, may. be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." The court concurs with the Government's position.

In *United States v. Cabrales*, 524 U.S. 1, 118 S.Ct. 1772, 1776, 141 L.Ed.2d 1 (1998) (quoting *United States v. Anderson*, 328 U.S. 699, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946)), the Supreme Court adhered to the principle that the "locus delicti [of the charged offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it." "In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez–Moreno*, 526 U.S. 275, 119 S.Ct. 1239, 1242–43, 143 L.Ed.2d 388 (1999). As further stated in *United States v. Lombardo*, 241 U.S. 73, 36 S.Ct. 508, 510, 60 L.Ed. 897 (1916), "where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *cf. Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912) (venue proper against defendant in district where co-conspirator carried out overt acts even though there was no evidence that the defendant had ever entered that district or that the conspiracy was formed there).

In the instant case, the Superseding Indictment charges the Defendants, including Ian Orville Aiken, with a criminal enterprise and racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). The criminal enterprise and racketeering conspiracy is alleged to involve multiple acts of murder, including the murder of Derrick Christian. In other words, Ian Aiken is not simply charged with the unitary crime of murder; rather, he has been charged with the commission, within the framework of a RICO enterprise, of a violent act designed to further the activities of the Moscow Posse.

Section 1959 is not merely a murder statute; instead, it serves as an adjunct to RICO, and governs other crimes as well as murder when committed in connection with RICO enterprises. The enterprise contemplated by Section 1959 is a RICO enterprise, and the murders contemplated by Section 1959 are those which occur not as single, solitary acts, but as part of the larger structure of the criminal enterprise. *See United States v. Concepcion*, 983 F.2d 369, 380–81 (2d Cir.1992) (legislative history of Section 1959 states that one of the statute's aims was to proscribe "murder and other violent crimes committed as an integral aspect of membership in [RICO] enterprises"), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *United States v. Perez*, 940 F.Supp. 540, 547 (S.D.N.Y.1996), *affirmed on other grounds, United States v. Ramos*, 182 F.3d 902, 1999 WL 461740 (2nd Cir.), *cert. denied, Perez v. United States*, —— U.S. ——, 120 S.Ct. 278, 145 L.Ed.2d 233 (1999). While the Christian murder is alleged to have occurred in the Eastern District of New York, the activities of the enterprise are alleged to touch a number of districts across the United States, including the Southern District of Florida. As charged in the Superseding Indictment, the framework of the enterprise included racketeering acts committed in Florida, Missouri and New York. The activities of the enterprise are alleged to include various acts of violence, as well as narcotics trafficking in "various cities in the United States."

"In light of the close association between Section 1959 and RICO, the underlying Section 1959 crime-in this case, murder—is necessarily closely associated with and an integral aspect of membership in the RICO enterprise. Therefore, the Section 1959 violation constitutes a continuing offense under Section 3237(a)." *United States v. Perez*, 940 F.Supp. at 548. Any venue appropriate for a prosecution of

a continuing offense under RICO would be similarly appropriate for such a continuous offense under Section 1959, and, therefore, Sections 3235 and 3236 do not govern venue here. As the racketeering conspiracy and related counts of the superseding indictment are properly triable in the Southern District of Florida, the murder of Derrick Christian can be tried here as well. To do otherwise would result in great inconvenience for the government and the judiciary.

## II. MOTIONS OF THE CAPITAL DEFENDANT AND THE NON-CAPITAL DEFENDANTS FOR SEVERANCE.

The capital defendant, Ian Orville Aiken, has filed a motion for severance from the non-capital defendants, Roland David Aiken, Daniel Patrick Aiken, Donovan Sibbley and Eric Livingston Morris. His motion is filed pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure and the Fourth, Fifth, Sixth and Eight Amendments to the United States Constitution on the grounds that certain counts are misjoined, and that, as the sole defendant facing the death penalty, he is prejudiced by the joinder of the non-capital defendants. In turn, the non-capital defendants have filed their own motions seeking severance from Ian Orville Aiken in order to avoid a claimed substantial prejudice to their fair trial rights. Each motion warrants a separate discussion and analysis.

### I. General Legal Analysis.

### A. Joinder

▮▮▮ Rule 8(b) states that "two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). In examining a Rule 8(b) challenge to joinder, a district court must determine through examination of the face of the complaint whether joinder was appropriate. *See*

*United States v. Morales,* 868 F.2d 1562, 1568–69 (11th Cir.1989). "Joinder of multiple defendants is proper whenever there is a 'common thread' between the actions charged against them." *United States v. Saget,* 991 F.2d 702, 707 (11th Cir.1993). "Rule 8(b) ... makes clear that joinder of the defendants for trial is proper where the indictment charges multiple defendants with a single conspiracy and also charges some of the defendants *with substantive counts arising out of the conspiracy.*" *United States v. Simon,* 839 F.2d 1461, 1472 (11th Cir.1988) (emphasis added); *accord United States v. Alvarez,* 755 F.2d 830, 857 (11th Cir.1985) ("Joinder under Rule 8(b) of the Federal Rules of Criminal Procedure is proper where, as here, an indictment charges multiple defendants with participation in a single conspiracy and also charges some but not all of the defendants with substantive counts arising out of the conspiracy.").

Guided by these principles, and after examination of the superceding indictment, the Court concludes that joinder was proper in the case at bar. The court concludes, contrary to Defendant Ian Aiken's position, that counts seven, eight, and nine [the carjacking counts] are properly joined with the remaining counts of the superseding indictment. The superceding indictment charges all the defendants with a criminal enterprise and a racketeering conspiracy. The "common thread" linking the defendants is this alleged racketeering conspiracy. *Morales,* 868 F.2d at 1568–69. For instance, count seven is predicated on count two [conspiracy to murder in aid of racketeering]. In turn, counts eight and nine are inextricably linked to count seven, and involve two of the same participants as charged in the racketeering conspiracy along with Ian Aiken. Since the acts alleged in the various counts are connected together, if not inextricably linked, in terms of common objective, mode of operation, and participants, joinder is permissible. *See United States v. Andrews,* 765 F.2d 1491, 1496–1497 (11th Cir.1985), *cert. denied sub. nom., Royster v. United*

**1352**

*States,* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986) (joinder proper where offenses were part of "series of transactions" which were facially similar, and there was substantial overlap of participants who shared same objective and displayed common mode of operation); *see also United States v. Friedman,* 854 F.2d 535, 561 (2d Cir.), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989) ("The presence of a substantive RICO count under 18 U.S.C. § 1962(c), and of a RICO conspiracy count under 18 U.S.C. § 1962(d), further broadens the government's power to charge multiple defendants together. A RICO charge under § 1962(c) necessarily incorporates allegations that each of the defendants named was associated with or employed by the same enterprise, and participated in the enterprise by engaging in at least two acts of racketeering related to the enterprise.")

Having concluded that joinder of the defendants here is proper, the next question is whether a joint trial is permissible under the principles of Fed.R.Crim.P. Rule 14.

**B.** *Severance.*

 Rule 14 provides that "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Fed.R.Crim.P. 14. The general rule in conspiracy cases like this one is that "persons who are charged together should be tried together." *United States v. Cassano,* 132 F.3d 646, 650–651 (11th Cir.1998) ("The general rule is that defendants *indicted together should be tried together.... This rule is particularly applicable to conspiracy cases."*) (citation omitted and emphasis added); *see also United States v. Adams,* 1 F.3d 1566, 1578 (11th Cir.1993) (quoting *Saget,* 991 F.2d at 707); *Morales,* 868 F.2d at 1571. The preference for a joint trial of multiple defendants in conspiracy cases reflects the sound policy of joinder where charges may be proven with substantially the same evidence. *United States v. Dorsey,* 819 F.2d 1055, 1058 (11th Cir.1987). The district courts are called to balance the public's interest in judicial economy and efficiency with any prejudice that the defendant may suffer from a joint trial. *See United States v. Cross,* 928 F.2d 1030, 1037 (11th Cir.1991); *Dorsey,* 819 F.2d at 1058. The fact one or more defendants may have a better chance at acquittal if tried separately does not alone entitle him to a severance. *See Cassano,* 132 F.3d at 651.

 Although joinder is proper under Rule 8(b), a district court may order Rule 14 severance under two circumstances, when (1) there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or (2) a joint trial would prevent the jury from making a reliable judgment about guilt or innocence. *See Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *United States v. Talley,* 108 F.3d 277, 279–280 (11th Cir. 1997). "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro,* 506 U.S. at 538–539, 113 S.Ct. at 938. Severance is appropriate, therefore, when a defendant demonstrates that he or she suffered a "substantial" or "compelling" prejudice to his or her right to a fair trial. *Zafiro,* 506 U.S. at 540, 113 S.Ct. at 938; *United States v. Condon,* 132 F.3d 653, 658 (11th Cir.1998); *Saget,* 991 F.2d at 707; *Dorsey,* 819 F.2d at 1058. " 'Compelling prejudice' is demonstrated by a showing that the jury was unable to make an individualized determination as to each defendant." *Saget,* 991 F.2d at 707. Limiting instructions, however, "often will suffice to cure any risk of prejudice." *Zafiro,* 506 U.S. at 539, 113 S.Ct. at 938; *Talley,* 108 F.3d at 280.

 Moreover, prejudice is not demonstrated when the evidence would be admissible at separate trials. *See, e.g., United*

*States v. Windom,* 19 F.3d 1190, 1198 (7th Cir.), *cert. denied,* 513 U.S. 862, 115 S.Ct. 174, 130 L.Ed.2d 110 ("[P]rejudice requiring severance is not shown if evidence on the severed counts would be admissible in the trial of the remaining counts."); *United States v. Ballis,* 28 F.3d 1399, 1408–1409 (5th Cir.1994) ("No prejudice inures to the defendant where a severance of counts would not result in a segregation of evidence.")

The reasoning underlying these cases is well-founded and explained in *Richardson v. Marsh,* 481 U.S. 200, 210, 107 S.Ct. 1702, 1708–09, 95 L.Ed.2d 176 (1987):

> It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Moreover, the Supreme Court has held that "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal

2. The non-capital defendants also recognize the weight of authority against severance, but join Ian Aiken in arguing that capital cases present entirely different issues than those regularly confronted in non-capital cases. They contend that in the great majority of federal death penalty cases, some type of severance has been granted. While this may be true, each case must be decided on its unique facts and circumstances. As discussed below, the United States Supreme Court has not adopted bright line test requiring severance each time a capital and non-capital defendant or defendants are indicted together.

in separate trials." *Zafiro,* 113 S.Ct. at 938. Likewise, the Eleventh Circuit has placed a heavy burden on a defendant who seeks to obtain a reversal on the basis of the denial of a severance motion:

> [A] showing of compelling prejudice must be made before a trial court's ruling will be viewed as an abuse of discretion. A reviewing court must consider whether the jury could "individualize each defendant in his relation to the mass," that is, whether the jury could avoid cumulating the evidence against all of the defendants and could make individualized guilt determinations. The jury's ability to reach different verdicts as to different defendants is one factor which weighs in favor of the jury's ability to make individualized determinations and against a finding of abuse in refusing severance.

*United States v. Watchmaker,* 761 F.2d 1459, 1476 (11th Cir.1985) (quoting in part *Kotteakos v. United States,* 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946)) (citations omitted).

### C. Severance of Capital Defendant from Non–Capital Defendants.

While recognizing the weight of authority against severance in non-capital cases [Defendant Ian Aiken's Motion for Severance, page 10], Ian Aiken, as the only capital defendant, argues that the balance is opposite in capital cases due to unfair prejudice by a joint trial.[2] He contends that several arguments support his position. First, he claims prejudice in the guilt phase by virtue of the "prosecutorial expertise"[3] argument; that is, due to the

3. Defendant Ian Aiken argues that by structuring the prosecution to include two substantially similar murders with the government seeking the death penalty for one defendant for one murder, but foregoing seeking the death penalty as to his co-defendant for the same murder and foregoing the death penalty as to the three alleged perpetrators of the other murder, the government is promulgating the impermissible "prosecutorial expertise" argument.

special procedures affecting the capital defendant, the jury will perceive that there has been a legal determination, perhaps even a judicial one, that he is the most culpable defendant. Second, he will suffer spillover prejudice through a "reverse halo effect," whereby as the leader of the Moscow Posse he will be held accountable by the jury for all the faults and acts of his co-defendants. Third, he will suffer prejudice at the sentencing phase, where the jury will improperly consider the actions of the organization and punish him for those actions. Fourth, he will suffer racial prejudice if tried with his co-defendants.[4] Finally, fifth, he will be denied a fair trial due to the introduction of post-arrest statements of a co-defendant.[5] The court concludes that only the first three points warrant discussion.

The United States Supreme Court has not developed a bright line test mandating severance whenever capital and non-capital defendants are charged together, but has recognized a strong preference for trying defendants who are indicted together in joint trials. *See Zafiro,* 113 S.Ct. at 937 ("There is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials 'play a vital role in the criminal justice system.' ") (citation omitted); *Buchanan v. Kentucky,* 483 U.S. 402, 418, 107 S.Ct. 2906, 2915, 97 L.Ed.2d 336 (1987) ("Underlying the Commonwealth's interest in a joint trial is a related interest in promoting the reliability and consistency of its judicial process, an interest that may benefit the noncapital defendant as well. In joint trials, the jury obtains a more complete view of all the acts underlying the charges than would be possible in separate trials. From such a perspective, it may be able to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in sentencing.").

In construing the Sixth Amendment, the Supreme Court has ruled that in a capital case, a capital defendant may be tried before a death-qualified jury, *Lockhart v. McCree,* 476 U.S. 162, 173–85, 106 S.Ct. 1758, 1764–70, 90 L.Ed.2d 137 (1986), and that in joint trials part of which involved a capital crime, non-capital defendants may be tried before a death-qualified jury together with capital defendants. *See Buchanan v. Kentucky,* 107 S.Ct. at 2916. In *Buchanan,* the non-capital defendant failed to move for severance, although the capital defendant did so move and his motion was denied by the trial court. *Buchanan,* 107 S.Ct. at 2910 n. 5. The Court's inquiry, however, was limited to the narrow issue raised by the non-capital defendant; that is, whether he was deprived of his right to an impartial jury, representative of a fair cross section of the community, because the government was permitted to "death qualify" the jury in his joint trial where the death penalty was sought against his co-defendant. As noted below, *Buchanan* more directly applies to the arguments raised by the non-capital defendants than by Ian Aiken.

The essential question remains whether any, or all, of the grounds assert-

---

4. Defendant Ian Orville Aiken does not argue that the risk of racial prejudice stems entirely from joinder of the defendants, or that separate trials will remove all risk of such prejudice. Rather, he argues: "It is plain that a group gang trial greatly exacerbates the risk that the defendant's minority status will have a substantial adverse effect on the jury's determination of the single capital defendant's sentence." Defendant Ian Aiken's Motion for Severance, page 18. But, as also acknowledged by the Defendant, "In § 3593(f) ... Congress has gone well beyond such minimal constitutional requirements in directing federal trial courts to implement unprecedented measures—consisting of jury instructions and certifications—to guard against the effect of racism in capital sentencing proceedings." *Id.* at page 19.

5. Ian Aiken argues that a severance from co-defendant Patrick Aiken might be warranted on the ground that the Government may seek to admit Patrick Aiken's single post-arrest statement that Ian Aiken is the leader of the Moscow Posse. Assuming a *Bruton* violation, the statement would either have to be redacted or other relief fashioned.

ed by Ian Aiken pose a specific risk to one of his trial rights, or would prevent the jury from making a reliable judgment about guilt or innocence. *See Zafiro,* 113 S.Ct. at 938. Upon review, the court concludes that the Defendant has failed to demonstrate a specific and compelling prejudice that will result in an unfair trial by participating in a joint trial. Admittedly, in a complex case involving multiple defendants, including a capital defendant, the risk of prejudice is heightened.[6] But, "the Constitution does not guarantee a trial free from the prejudice that inevitably accompanies any charge of heinous group crime; it demands only that the potential for transference of guilt be minimized to the extent possible under the circumstances...." *United States v. Elliott,* 571 F.2d 880, 905 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Therefore, the prejudice must be of a type which the trial court is unable to afford protection. *See United States v. Causey,* 185 F.3d 407, 416–417 (5th Cir. 1999) (rejecting non-capital defendant's argument of "spillover prejudice" and affirming denial of severance requested by the non-capital defendant). Thus, before granting severance, the court is constrained to consider whether less drastic measures, such as limiting instructions at the guilt and penalty phase, will suffice to cure any risk of prejudice. *See Richardson,* 107 S.Ct. at 1708; *Zafiro,* 113 S.Ct. at 938.[7] It is noteworthy that the Eleventh Circuit in a complex RICO case, found that the giving of limiting instructions where appropriate, and inquiring of the jurors individually whether they understood those instructions, mitigated against any compelling prejudice in a year long joint trial. *See United States v. Starrett,* 55 F.3d 1525, 1553 (11th Cir.1995).

■ Here, Defendant Ian Aiken has not demonstrated, consistent with any persuasive authority, that appropriate limiting instructions would fail to cure any potential prejudice as asserted in his points one through three. To the contrary, "[t]he most efficacious tool to protect against this danger [the spillover effect] is a clear cautionary instruction from the trial court as to the duty of the jurors to consider each defendant and the evidence against him or her separately." *United States v. Kopituk,* 690 F.2d 1289, 1320 (11th Cir.1982) (in a massive and complex RICO case involving 12 defendants, 130 witnesses, 22,000 pages of trial transcript, seven months of trial, and a 70–count indictment, the jury's verdict indicated that it was able to adhere to the jury's instruction to consider each defendant and the evidence against him or her separately); *see also Talley,* 108 F.3d at 280 ("[L]imiting instructions often will suffice to cure any risk of prejudice."); *Shannon v. United States,* 512 U.S. 573, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Richardson,* 481 U.S. at 206, 107 S.Ct. 1702) (it is "'the almost invariable assumption of the law that jurors follow their instructions."). The same "almost invariable assumption" applies equally in a capital case. *See Marshall v. Lonberger,* 459 U.S. 422, 428 n. 6, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) ("[T]he crucial assumption underlying the system of trial by jury is that juries will follow the instructions

---

6. *But see, e.g., United States v. Phillips,* 664 F.2d 971, 1016–17 (1981), *superceded by rule on other grounds, United States v. Huntress,* 956 F.2d 1309 (5th Cir.1992) (six month trial; 36–count, 100 page indictment; 12 defendants); *United States v. Martino,* 648 F.2d 367, 385–86 (5th Cir.1981) (20 defendants, most with Spanish or Italian surnames; 35–count indictment; three month trial; more than 200 witnesses); *United States v. Morrow,* 537 F.2d 120, 135–137 (5th Cir.1976) (23 defendants). In *United States v. Kopituk,* 690 F.2d 1289, 1320 (11th Cir.1982), the court cited the cases above to stand for the proposi-

tion that "it is not enough simply to show that the trial was lengthy and/or complex. It is necessary to demonstrate with particularity compelling prejudice and appellants have failed in this regard."

7. By limiting instructions, the jury in this case would be directed that they may not consider, in determining Ian Aiken's guilt or innocence, the fact that the Government has sought the death penalty against him, or that the death penalty is not being requested against his co-defendants.

given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because a jury was improperly instructed.").

■ Moreover, Ian Orville Aiken's right to "a fair trial does not include the right to exclude relevant and competent evidence." *Zafiro*, 113 S.Ct. at 938. The very nature of the charged RICO conspiracy warrants the conclusion that, even if two separate juries were empaneled, both trials would involve substantially the same evidence. Ian Aiken is named in all the significant RICO charges by the very nature of his alleged involvement as the leader of the Moscow Posse.[8] Under such circumstances, the claim that separate trials would eliminate the so-called "spillover prejudice" is at least overstated if not entirely without merit. *See United States v. Kopituk*, 690 F.2d 1289, 1320 (11th Cir. 1982) (holding that a curative instruction is the "most efficacious tool to protect against" the danger of spillover); *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir.), *cert. denied*, 506 U.S. 830, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992) (". . . evidence of those [criminal] acts is relevant to the RICO charges against each defendant, and the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless"); *see also United States v. Forrest*, 623 F.2d 1107, 1115 (5th Cir.), *cert. denied*, 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980) (dismissing argument that jury might find evidence of one offense as corroborative of a second crime; court reasoned that this prejudice exists whenever a defendant is charged with multiple counts); *United States v. Williamson*, 482 F.2d 508, 511 (5th Cir.1973) (motion for severance denied since even if offenses severed, evidence of one would be admissible in trial of other).

Both defendant Ian Aiken and the non-capital defendants have not met their heavy burden to show that the claimed spillover prejudice will prevent the jury from "individualiz[ing] each defendant in his relation to the mass." *United States v. Watchmaker*, 761 F.2d 1459, 1476 (11th Cir.1985); *United States v. Hogan*, 986 F.2d 1364, 1375 (11th Cir.1993) ("This is a heavy burden, and one which mere conclusory allegations cannot carry.") Rather, to paraphrase *Buchanan*, 107 S.Ct. at 2915, the jury, in considering the evidence of RICO criminal enterprise and conspiracy as to all defendants in a joint trial, may be able to obtain a more complete view of all the acts underlying the charges and may be able to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in the sentencing.

### D. Severance of Non-capital Defendants from Capital Defendants.

The non-capital defendants claim that they will be denied a fair trial and will be denied due process of law if they are forced to proceed to a joint trial with the capital defendant, Ian Aiken. Their primary basis for asserting "compelling prejudice" stems from the impact of death-qualifying the jury, a process required in a capital case which they argue, "inevitably produces a pro-prosecution jury that is more conviction prone." [Motion for Severance of Non–Capital Defendants, page 3]. They further argue that the disparity in the alleged roles of and the quantum of evidence against the capital defendant and non-capital co-defendants "will inevitably create antagonistic defenses between the capital defendant and the non-capital co-defendants." *Id.*

---

**8.** The Government asserts in its "Omnibus Response to Defendants' Motion for Severance, page 11, "In this case, proof of the conduct underlying the predicate racketeering acts of murder, both capital and non-capital, robberies, home invasions, kidnaping and narcotics trafficking, would be admissible, indeed necessary, to prove the existence, nature and activities of the enterprise of which all of the defendants were members."

### 1. Claims of Prejudice Due To the Selection of a Death Qualified Jury.

■ In *Buchanan*, the Supreme Court held against the position of the non-capital defendants in this case, explaining:

> Where ... one of the joined defendants is a capital defendant and the capital-sentencing scheme requires the use of the same jury for the guilt and penalty phases of the capital defendant's trial, the interest in this scheme, which the Court recognized as significant ..., coupled with the [state's] interest in a joint trial, argues strongly in favor of permitting "death qualification" of the jury.... [T]he particular concern about the possible effect of an "imbalanced jury" in the "special context of capital sentencing," is not present with respect to the guilt and sentencing phases of a noncapital defendant in this case. For, at the guilt phase, the jury's discretion traditionally is more channeled than at a capital-sentencing proceeding, and, at the penalty phase, the jury's sentence is limited to specific statutory sentences and is subject to review by the judge.

483 U.S. at 419–20, 107 S.Ct. at 2915–16 (citations omitted); *see also United States v. Sanchez*, 75 F.3d 603, 604–605 (10th Cir.), *cert. denied*, 517 U.S. 1214, 116 S.Ct. 1838, 134 L.Ed.2d 941 (1996) ("Further, the *Buchanan* Court squarely rejected Mr. Sanchez's [non-capital defendant] contention that a 'death qualified' jury lacks impartiality.") (citations omitted).

■ Relying on *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the *Buchanan* Court directly rejected the non-capital defendant's argument that "death qualification" prior to the guilt phase of the trial violated his right under the Sixth and Fourteenth Amendments to an impartial jury selected from a representative cross section of the community. *Buchanan*, 107 S.Ct. at 2913. It also rejected the argument that the non-

capital defendant was denied his right to an impartial jury because of the removal of "Witherspoon-excludables" from the jury at his joint trial. *Id.* at 2913–14. For the same reasons, the court rejects the non-capital defendants' similar arguments here.[9]

### 2. Claims of Prejudice Due to Antagonistic Defenses.

■ The non-capital defendants discuss antagonistic defenses in terms of "potential defenses." [Motion for Severance of Non–Capital Defendants, page 13.] Their "potential defenses" leave this court to speculate as to why there will be irreconcilable conflicts, or why, with proper curative instructions and evidentiary rulings, prejudice cannot be avoided.

The essence of their position seem to be that the jury will be forced to choose between convicting Ian Aiken or one or more of the non-capital defendants, guaranteeing that at least one or more defendants will be convicted. However, in light of the United States Supreme Court's decision in *Zafiro* and the Eleventh Circuit's decision in *United States v. Talley*, 108 F.3d 277 (11th Cir.1997), this argument is without merit.

In *Zafiro*, the defendants argued that by asserting mutually antagonistic defenses, the jury would conclude either: "(1) that both defendants [were] lying and convict them both on that basis, or (2) that at least one of the two must be guilty without regard to whether the Government had proved its case beyond a reasonable doubt." *Zafiro*, 113 S.Ct. at 938. *Zafiro* rejected defendants' arguments reasoning that "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* The Court further held that any prejudice resulting from the mutually antagonistic defenses could be cured with proper instructions.[10] The Court also found that defendants had not suffered such preju-

---

9. The court also concludes the non-capital defendants' argument that possible differences between them and the capital defendant during jury selection does not demonstrate compelling prejudice warranting severance.

10. "The District Court properly instructed the jury that the Government had 'the burden of proving beyond a reasonable doubt' that each defendant committed the crimes with which he or she was charged. The Court then in-

dice, because the government had met its burden in proving each defendant's guilt beyond a reasonable doubt. *Id.* at 113 S.Ct. at 939; *see also Talley,* 108 F.3d at 280–82 (holding that defendants could not rely on defense of mutually antagonistic defenses in light of *Zafiro* because the government had met its burden of proof); *United States v. Linn,* 31 F.3d 987, 992 (10th Cir.1994) (holding that mutual antagonism of defendants' defenses did not require severance, because jury could have believed all the defendants' theories and acquitted them all).

### 4. *Severance and Judicial Economy.*

▮ The defendants claim that a severance would serve the interests of judicial economy, although Ian Aiken does not say how two trials would achieve that goal. The remaining defendants claim that judicial economy will be served because jury selection for their trial will take less time than selection of a death qualified jury. They also claim that most of the evidence in the case is relevant only to the trial of Ian Aiken and that, therefore, their trial will take less time than Ian Aiken's trial. In the court's view, these claims are not persuasive.

The Government indicates in its response to the severance motions that it will be severely prejudiced by the granting of separate trials. Since the principal charge is the racketeering enterprise conspiracy, and not the charged murders, the Government contends that a majority of its witnesses will testify regarding this aspect. According to the Government, the prosecu-

tion will address charged criminal activity of the Defendants allegedly occurring throughout the United States and in Jamaica. Several witnesses are in the witness protection programs. The Government asserts that severance will present a "marked increased danger to the Government's witnesses." Government's Omnibus Response to Defendants' Motions for Severance, pages 21–22. It claims that "the hallmark of this organization is witness intimidation, harassment and elimination. The indicting grand jury found the Moscow Posse utilizes obstruction of justice through the intimidation and elimination of testifying witnesses. A severed trial would result in the exposure of those witnesses, their identities, their possible locations and subject them to a palpable risk of danger." *Id.*

The claimed danger to witnesses has not been established in any proceeding and is addressed only in *ex parte* affidavits concerning discovery related issues. Nonetheless, the court cannot ignore the seriousness of the Governments' assertion and must balance the Defendants' allegations of prejudice against the interest of judicial economy and concomitant policy favoring joint trials in conspiracy cases.

Thus, for the reasons stated above, the court declines to grant severance. Nonetheless, neither the Government nor the Defendants has requested use of a bifurcated trial in which two juries are empaneled at the same time to hear evidence and adjudicate the guilt or innocence of the capital defendant and the non-capital defendants separately.[11] Although not con-

---

structed the jury that it must 'give separate consideration to each individual defendant and to each separate charge against him. Each defendant is entitled to have his or her case determined from his or her own conduct and from the evidence [that] may be applicable to him or to her.' In addition, the District Court admonished the jury that opening and closing arguments are not evidence and that it should draw no inferences from a defendant's exercise of the right to silence. These instructions sufficed to cure any possibility of prejudice." *Zafiro,* 113 S.Ct. at 939 (citations omitted).

11. Pursuant to this technique, two juries would be impaneled. The first jury would be selected by the non-capital defendants and by the Government from a venire panel that would not be death-qualified. The non-capital defendants and the Government would be permitted to exercise their respective cause and peremptory challenges to this panel without regard to the capital defendant. The second jury would be selected only by the capital defendant and the Government from a second, separate venire panel that would be death qualified outside the presence of the first panel. Only the second panel would receive and respond to a jury questionnaire

stitutionally required, *see Buchanan,* 107 S.Ct. at 2916 n. 18, a bifurcated procedure in non-capital cases has been recognized by the Eleventh Circuit. *See United States v. Hayes,* 676 F.2d 1359 (11th Cir. 1982). Whether the empaneling of two juries, one being death qualified and the other non-death qualified, would be advantageous to reduce potential claims of prejudice or merely interject additional constitutional issues will be left for another day, assuming one side or the other is interested in pursuing it.

**WHEREFORE,** it is *ORDERED:*

1. Defendant Ian Aiken's motion to dismiss count three of the Second Superseding Indictment is **DENIED.**

2. Defendant Ian Aiken's motion for severance is **DENIED.**

3. Defendants Roland David Aiken, Daniel Patrick Aiken, Donovan Sibbley and Eric Livingston Morris' motions for severance are **DENIED.**

4. The parties shall file with the court within ten days from the date below any motion requesting a bifurcated jury procedure. In the event no motions are filed, no party may request such a procedure thereafter. In the event a motion is filed, the other party or parties shall respond within seven days and state their agreement, objection, and recommendations, if any, for new or modified procedures from those discussed above. Final argument on

any motions shall be heard on December 3, 1999 at 9:00 A.M.

ascertaining their individual views towards the death penalty. The capital defendant and the Government would be permitted to separately exercise their cause challenges and peremptory challenges for the second panel without participation by the non-capital defendants. The first jury would decide the guilt or innocence of only the non-capital defendants. The second jury would decide the guilt or innocence of only the capital defendant. The second panel would be the jury to participate in the penalty phase pursuant to 18 U.S.C. § 3593(b)(1) in the event of a guilty verdict as to the capital defendant. Separate openings and closings would be conducted for each jury. Each jury would be instructed to consider only the evidence relevant to the particular defendant(s) whom they would be trying and to not speculate about, or be influenced by, the fact that two juries have been empaneled. Each panel will be kept in separate jury rooms. Each will be instructed against co-mingling. Each will be assigned their own court security officer who shall be instructed to maintain the separation of the two juries. The two juries shall hear the same evidence presented by the Government as against all defendants, unless specifically ordered otherwise by the court. Separate verdict forms shall be entered by each jury on the guilt phase, although both juries will instructed together with a single set of instructions.